# SUPREME JUDICIAL COURT

###### FOR THE

## COUNTY OF MIDDLESEX, OCTOBER TERM 1854, AT CAMBRIDGE.

━━━

#### PRESENT:

Hon. LEMUEL SHAW, Chief Justice.
Hon. CHARLES A. DEWEY,
Hon. THERON METCALF,
Hon. GEORGE T. BIGELOW, } Justices
Hon. BENJAMIN F. THOMAS,
Hon. PLINY MERRICK,

---

## Boston and Lowell Railroad Corporation vs. Salem and Lowell Railroad Company & others.

A railroad corporation, who are unlawfully disturbed in the enjoyment of their franchise by another railroad corporation, may maintain a bill in equity in this court for an injunction of such disturbance as of a nuisance; and are not obliged to apply to the county commissioners for damages, under Rev. Sts. c. 39, § 56; nor to this court for leave to file an information in the nature of a *quo warranto*, under St. 1852, c. 312, § 42.

The provision of § 12 of the act incorporating the Boston and Lowell Railroad Corporation, (*St.* 1830, *c.* 4,) "that no other railroad than the one hereby granted shall, within thirty years from and after the passing of this act, be authorized to be made, leading from Boston, Charlestown or Cambridge to Lowell," (the legislature also reserving, in this act, the right to regulate the tolls to a certain extent, and to purchase the franchise upon certain terms,) constituted a contract by the Commonwealth with the Boston and

Boston and Lowell Railroad Corporation *v.* Salem and Lowell Railroad Co. & others.

Lowell Railroad Corporation, that no other railroad from Boston, Charlestown or Cambridge to Lowell should be lawfully made for thirty years; and was within the constitutional power of the legislature to make, and binding upon their successors.

The exclusive right, for thirty years, to a railroad between Boston, Cambridge or Charlestown and Lowell, conferred on the Boston and Lowell Railroad Corporation by their charter, is subject, like other private property, whenever, in the opinion of the legislature, the public exigencies require it, to be appropriated to public uses, reasonable compensation being made.

An act of the legislature, appropriating private property to public uses, under the power of eminent domain, in order to be consistent with art. 10 of the Declaration of Rights, must show by express words, or necessary implication, the intention of the legislature to exercise this power, and must be accompanied by provisions for making compensation to the owner.

The *St.* of 1852, *c.* 118, authorizing the Boston and Maine Railroad and the Salem and Lowell Railroad Company, each of them, to enter upon and use the railroad of the other "*according to law; provided that nothing contained in this act shall be construed to impair the rights of any person or corporation;*" does not express an intention on the part of the legislature to appropriate to public uses any of the rights of the Boston and Lowell Railroad Corporation under § 12 of their charter; and confers no authority upon the Boston and Maine Railroad and the Salem and Lowell Railroad Company, by the use and combination of sections of their respective roads with a portion of the road of the Lowell and Lawrence Railroad Company, to establish a continuous line of transportation by railroad between Boston and Lowell.

BILL IN EQUITY, filed on the 14th day of June 1852, by the Boston and Lowell Railroad Corporation, against the Salem and Lowell Railroad Company, the Boston and Maine Railroad, and the Lowell and Lawrence Railroad Company.

The bill alleged that by an act passed on the 5th of June 1830, (*St.* 1830, *c.* 4,) a charter of incorporation was granted to the plaintiffs by the legislature of this commonwealth, (which was set forth at length in the bill,) and by the first section of which John F. Loring and others named, their associates, successors and assigns, are made a body corporate, under the name of the Boston and Lowell Railroad Corporation, with power to sue and be sued, and have a common seal; and are "vested with all the powers, privileges and immunities, which are or may be necessary to carry into effect the purposes and objects of this act, as hereinafter set forth. And the said corporation are hereby authorized and empowered to locate, construct and finally complete a railroad, at or near the city of Boston, and thence to Lowell in the county of Middlesex, in such manner and form as they shall deem to be most expedient; and for this

purpose the said corporation are authorized to lay out their road, at least four rods wide through the whole length; and for the purpose of cuttings, embankments, and stone and gravel, may take as much more land as may be necessary for the proper construction and security of said road." Section 2 provides that the capital stock of said corporation shall consist of one thousand shares; and by § 3 the president and directors are authorized to lay assessments to the amount of five hundred dollars on each share. The act also contains the following provisions:

" Section 5. Be it further enacted, that a toll be and hereby is granted and established, for the sole benefit of said corporation, upon all passengers and property of all descriptions which may be conveyed or transported upon said road, at such rates per mile as may be agreed upon and established from time to time by the directors of said corporation. The transportation of persons and property, the construction of wheels, the form of cars and carriages, the weight of loads, and all other matters and things in relation to the use of said road, shall be in conformity to such rules, regulations and provisions as the directors shall from time to time prescribe and direct, and said road may be used by any person who shall comply with such rules and regulations: Provided, however, that if, at the expiration of four years from and after the completion of said road, the net income or receipts from tolls and other profits, taking the four years aforesaid as the basis of calculation, shall have amounted to more than ten per cent. per annum upon the cost of the road, the legislature may take measures to alter and reduce the rate of tolls and other profits in such manner as to take off the overplus for the next four years, calculating the amount of transportation upon the road to be the same as the four preceding years; and at the expiration of every four years thereafter the same proceedings may be had."

" Section 6. Be it further enacted, that the directors of said corporation for the time being are hereby authorized to erect toll houses, establish gates, appoint toll gatherers, and demand toll upon the road when completed, and upon such parts thereof

as shall be from time to time completed; and they shall, from year to year, make a report to the legislature of their acts and doings, receipts and expenditures, under the provisions of this act."

" SECTION 12. Be it further enacted, that no other railroad than the one hereby granted shall, within thirty years from and after the passing of this act, be authorized to be made, leading from Boston, Charlestown or Cambridge to Lowell, or from Boston, Charlestown or Cambridge to any place within five miles of the northern termination of the railroad hereby authorized to be made: Provided, that the State may authorize any company to enter with another railroad, at any point of said Boston and Lowell Railroad, paying for the right to use the same, or any part thereof, such a rate of toll as the legislature may from time to time prescribe, and complying with such rules and regulations as may be established by said Boston and Lowell Railroad Corporation, by virtue of the fifth section of this act: Provided, also, that it shall be in the power of the government, at any time during the continuance of the charter hereby granted, after the expiration of ten years from the opening for use of the railroad herein provided to be made, to purchase of the said corporation the said railroad, and all the franchise, property, rights and privileges of the said corporation, on paying therefor the amount expended in making the said railroad, and the expenses of repairs, and all other expenses relating thereto, with interest thereon, at the rate of ten per cent. per annum, deducting all sums received by the corporation from tolls or any other source of profit, and interest, at the rate of ten per cent. per annum thereon, that shall have been received by the stockholders; and after such purchase, the limitation provided in this section shall cease, and be of no effect."

The bill then alleged that said act of incorporation was duly accepted, and the plaintiffs became a corporation, possessed of all the rights, powers and privileges conferred by said charter; that subsequently certain other acts, in addition to said first named act, were passed by the legislature; (copies of which

were annexed to the bill;) that the same were duly accepted by the plaintiffs, with the exception of the second proviso of the *St.* of 1836, *c.* 146 ; and that thereby a contract, conformable to the terms of said charter, and of the acts thus accepted, was created between the Commonwealth and the plaintiffs.

The acts, copies of which were so annexed to the bill, were the following : *St.* 1830, *c.* 79, increasing the plaintiffs' capital stock to twelve hundred shares : *St.* 1832, *c.* 87, by the first section of which the government of the Commonwealth, at any time after the expiration of twenty years from the opening for use of the plaintiffs' road, may purchase the road, franchise, &c. of the corporation, on paying all expenses, and such additional sum as, together with the net profits received by them, will be equal to ten per cent. on the original cost: *St.* 1834, *c.* 1, by which the capital stock of the corporation is increased to twenty four hundred shares : *St.* 1836, *c.* 146, by which their capital stock is further increased 600 shares of $500 each ; provided, among other things, that the legislature, after twenty years from the opening of said railroad for use, may purchase the road, franchise, &c. by paying such a sum as, together with the whole sum received by said corporation from tolls and all other sources of profit, will reimburse them the amount of capital paid in, for constructing and keeping in repair said railroad, and other necessary expenses, with a net profit thereon of ten per cent. per annum ; " and provided also, that the legislature may, at all times, exercise the same powers in relation to altering, amending or repealing the said original act of incorporation, or any act in addition thereto, as are contained in the forty-fourth chapter of the revised statutes ; except that the tolls shall not be so fixed or altered, as to reduce the net profits arising from all sources to less than ten per cent. per annum ; and provided also, that the said last named proviso shall be null and void, unless the same shall be assented to by a majority of the stockholders of said corporation, within thirty days from the time when this act shall take effect : " *St.* 1838, *c.* 95, by the first section of which the plaintiffs are authorized to increase their capital stock by an amount not exceeding $300,000, in shares

1 *

of $500 each: And *Sts.* 1847, *cc.* 185, 253, which do not con-
tain any provisions material to the understanding of this case.

The bill then alleged that the plaintiffs, confiding in said acts
and the privileges therein granted to them, proceeded at great
cost and expense to construct and complete the said railroad,
and had ever since maintained and employed the same for the
transportation of persons and property, and had derived there-
from just and reasonable gains and profits; and had in all
respects conformed to the provisions and requirements of said
acts, which by them were to be kept and performed; and were
consequently entitled to enjoy the privileges and receive the
tolls in said acts granted to them, and especially to enjoy the
privileges granted in the twelfth section of their said charter,
namely, that no other railroad should, within thirty years from
and after the granting of their said charter, be authorized to be
made, leading from Boston or Charlestown or Cambridge to
Lowell, or from either of said places to any place within five
miles of the northern termination of their said road; and also
to enjoy the right of conveying and transporting persons and
property by railroad from Boston and Charlestown to Lowell,
and from Lowell to Boston and Charlestown, without hindrance,
competition or interruption from any other corporation or cor-
porations, authorized to own a railroad between other places,
by making use of their railroads, or portions of their lines of
railroad, to establish a nearly parallel railroad communication
from Lowell to Boston or Charlestown, and from Boston or
Charlestown to Lowell, and with a terminus in Lowell, or
within five miles of the terminus of the plaintiffs' road in
Lowell.

The bill then alleged that by *St.* 1845, *c.* 159, which was duly
accepted by the Boston and Maine Railroad and the Boston
and Maine Railroad Extension Company, said two corporations,
previously established by the laws of this commonwealth, were
united, and became one corporation, under the name of the
Boston and Maine Railroad, and the owners and proprietors
of the railroad known as the Boston and Maine Railroad,
constructed and leading from Boston into the State of Maine

and running through the town of Wilmington, and having its southern terminus in Boston : That by *St.* 1846, *c.* 157, certain persons were made a corporation by the name of the Lowell and Andover Railroad Company, with powers to construct a railroad from Lowell to a point in or near Andover, and to enter with their road upon a part of the Boston and Lowell Railroad in Lowell, and use the same ; that said act was duly accepted and said road built and constructed by said corporation from Lowell to Andover; and that the terminus of said road in Lowell was constructed within half a mile of the northern termination of the plaintiffs' road ; and that by *St.* 1848, *c.* 14, which was accepted by said corporation, it was provided that it should take and be known by the name of the Lowell and Lawrence Railroad Company : That by *St.* 1848, *c.* 223, certain persons were made a corporation by the name of the Salem and Lowell Railroad Company; that said act was duly accepted, and said corporation constructed their railroad from a point at or near Salem to a point on said Lowell and Lawrence Railroad, in the town of Tewksbury, where they effected a junction of their said road with the Lowell and Lawrence Railroad, and used the track of the Lowell and Lawrence Railroad Company to their terminus in Lowell, and in so doing constructed their railroad through the town of Wilmington, and there intersected the Boston and Maine Railroad. And copies of these acts were annexed to the bill.

The bill then alleged that by means of the said junction of the road of the Lowell and Lawrence Railroad Company with the road of the Salem and Lowell Railroad Company at Tewksbury, and by the intersection of the said last named road with the road of the Boston and Maine Railroad at Wilmington, the rail and other material of a line of railroad communication, nearly parallel with the plaintiffs' road, was created between Lowell and Boston, through Charlestown, only about one mile and six tenths of a mile longer than the plaintiffs' road, and at no point more than three miles and one third of a mile distant therefrom, having one terminus in Lowell within half a mile of the northern terminus of the plaintiffs' road, and a station house

for passengers in Charlestown, and the southern terminus in Boston a half a mile nearer to the centre of business in Boston than the southern terminus of the plaintiffs' road, by which line passengers and property could be conveyed and transported from Lowell to Charlestown or Boston, and from Boston or Charlestown to Lowell. But the plaintiffs well hoped that no such use of said roads, or portions thereof, would be made or suffered by the defendant corporations, and that the plaintiffs would be permitted peaceably, without interruption, molestation or interference, to have and enjoy the profit, benefit and advantage secured and intended to be secured to them by their act of incorporation, and the acts in addition thereto, of transporting passengers and property from Boston to Lowell, and from Charlestown to Lowell, and from Lowell to Boston, and from Lowell to Charlestown, and free from the competition of any other railroad, authorized to be made by the Commonwealth, extending from Boston, Charlestown or Cambridge, to any place within five miles of the northern terminus of the plaintiffs' road; and free from the competition of any other corporation or corporations, authorized by the legislature to run railroads between other places and to intersect and to unite with each other, but making use of their roads, or portions thereof, for establishing a railroad between Boston and Lowell, nearly parallel with the plaintiffs' road, and for transporting passengers from Boston and Charlestown to Lowell, and from Lowell to Boston and Charlestown, on the railroad thus established.

The bill then alleged that the defendants, combining, colluding and confederating together to deprive the plaintiffs of the reasonable gains and profits which they were entitled to receive from the transportation of passengers and property over their road, and to hinder them in the enjoyment of the rights and privileges to which they were entitled by virtue of their said contract with the Commonwealth, and especially under the twelfth section of their charter, did enter into a certain mutual agreement, understanding or arrangement to convey, and cause to be conveyed, passengers and property over portions of their said roads, by means of said junctions and intersections, from

Boston and Charlestown to the terminus of the Lowell and Lawrence Railroad in Lowell, and from Lowell to Boston and Charlestown, and by causing cars, and trains of cars, to run over said portions of each of their said roads at such times that passengers could exchange out of the cars of the Salem and Lowell Railroad Company into the cars of the Boston and Maine Railroad, and from the cars of the last mentioned railroad company into the cars of the Salem and Lowell Railroad Company, at said intersection at Wilmington; and in pursuance of said agreement and understanding, did, on or about the 28th of June, 1851, commence transporting, and had ever since continued to transport passengers and property over their said lines of road as aforesaid, from Boston and Charlestown to Lowell and from Lowell to Boston and Charlestown, using therefor the road of the Lowell and Lawrence Railroad Company from its terminus in Lowell to the place of its junction with the road of the Salem and Lowell Railroad Company in Tewksbury, and thence using therefor the road of the last mentioned company to its intersection with the road of the Boston and Maine Railroad in Wilmington, and thence using the said road of the last mentioned corporation; and for the purpose of more effectually injuring and competing with the plaintiffs in the transportation of passengers between said places, the defendants had from time to time, since entering into their said agreement and confederacy, published, and caused to be published, and still continued to publish and advertise the said route between Boston and Lowell, so made and formed as aforesaid by portions of their said roads, as a railroad route between Boston and Lowell, by publishing notices thereof in newspapers printed in said cities of Boston and Lowell, and by posting up printed notifications thereof in public places in said cities and in divers of the station houses on the roads of the defendant corporations; and had advertised and sold, and still continued to advertise and sell tickets for the transportation of passengers between said cities over said portions of their roads, and also season tickets and package tickets for the use of families and firms; and had employed and still did employ agents to divert and

dissuade passengers from travelling between said cities upon and over the plaintiffs' road, and to induce them to travel over the said roads of the defendant corporations; and by means of the premises had succeeded in deterring and preventing many persons from using the plaintiffs' road for the purpose of being transported from Boston and Charlestown to Lowell, and from Lowell to Boston and Charlestown, and in depriving the plaintiffs of the gain and profits which would have accrued to them from the transportation of such passengers between said cities over their said road; and that the defendant corporations, not content with the injury they had thus inflicted, and were still continuing to inflict upon the plaintiffs, had recently combined and mutually agreed, and now threatened and intended to transport and convey passengers and property between Boston and Lowell, and Charlestown and Lowell, over said portions of said roads, by means of cars, and trains of cars, to run entirely through without being changed, from the said terminus in one of said cities to the said terminus in the other, and without the necessity of the passengers being removed from one train of cars into another at Wilmington; all of which acts and doings, and threatened acts and doings, were and would be a nuisance to the rights and franchise of the plaintiffs, legally acquired as aforesaid under their said charter and acts in addition thereto.

The bill then alleged the protest of the plaintiffs against said acts done and threatened, a demand on the defendants to desist and to account with the plaintiffs for the gains and fares received for the transportation of passengers and property as aforesaid, and the defendants' refusal, and that the defendants claimed the right of such transportation under their acts of incorporation, and under *Sts.* 1851, *c.* 196, and 1852, *c.* 118; whereas the plaintiffs denied that said acts did or could legally confer upon the defendants any such powers.

The following is a copy of the statute of 1851, *c.* 196:

" An act to provide additional railroad accommodations for the town of Wilmington and the vicinity.

" SECTION 1. The ninth section of an act approved by the Governor on the sixteenth day of March in the year one

thousand eight hundred and forty four, entitled ' An act to establish the Boston and Maine Extension Company,' is hereby repealed.

" SECTION 2. So much of the eighth section of chapter two hundred and twenty three of the laws of the year one thousand eight hundred and forty eight, incorporating the Salem and Lowell Railroad Company, as provides that the cars of the said corporation shall not be permitted to stop for the purpose of receiving or delivering passengers or merchandise, at any point upon their track within one mile of the Boston and Maine Railroad, is hereby repealed.

" SECTION 3. Nothing in this act contained shall be so construed as to authorize the cars of the said Boston and Maine Railroad Company, or of any other corporation or persons, to be drawn from said last mentioned road over the road of the said Salem and Lowell Railroad Company; or the cars of the said Salem and Lowell Railroad Company, or of any other corporation or person, to be drawn from said last mentioned road over the road of the said Boston and Maine Railroad Company."

Section 9 of the act of March 16th 1844, (*St.* 1844, *c.* 172,) repealed by the first section of the above act, was in these words : " No depot or stopping place shall be established between Andover and Reading, without the consent of the Boston and Lowell Railroad Corporation." And section 8 of *St.* 1848, *c.* 223, incorporating the Salem and Lowell Railroad Company, referred to in the second section of the above act, is thus : " Said corporation may cross the track of the Boston and Maine Railroad; but no connection shall ever hereafter be formed between the tracks of said last named railroad corporation and those of the corporation hereby created ; nor shall the cars of the corporation hereby created be permitted to stop, for the purpose of receiving or delivering passengers or merchandise, at any point upon their own track, within one mile of the track of said Boston and Maine Railroad; and the supreme judicial court of this commonwealth shall have power to restrain by injunction any attempts which shall be made,

directly or indirectly, by the corporation hereby created, or by the Boston and Maine Railroad Corporation, to violate the conditions of this section. All injunctions as aforesaid may be granted by any justice of the supreme judicial court, according to the ordinary course of proceeding in courts of equity."

The other statute relied on by the defendants, ( *St.* 1852, *c.* 118,) is as follows :

" An act in relation to the Boston and Maine Railroad Company and the Salem and Lowell Railroad Company.

" SECTION 1. The Boston and Maine Railroad Company may enter upon and use the Salem and Lowell Railroad, according to law.

" SECTION 2. The Salem and Lowell Railroad Company may enter upon and use the Boston and Maine Railroad, according to law: Provided, that nothing contained in this act shall be construed to impair the rights of any person or corporation.

" SECTION 3. All acts and parts of acts, inconsistent with this act, are hereby repealed."

The bill then prayed for a discovery and an account, for specific relief by injunction, and for general relief, and for due process.

The three defendant corporations each filed a general demurrer. And the parties afterwards agreed, that the case should be heard and considered by the court, at the argument upon the bill and demurrer, as if a supplemental bill had been filed by the plaintiffs, charging the doing by the defendants of the several acts and things, which they were charged in the original bill with combining, threatening and preparing to do, and a general demurrer filed to such supplemental bill.

This case was argued at Boston in February 1854.

*J. Parker & S. H. Phillips*, ( *G. Minot* was with them,) for the defendants. I. The only grant of a franchise in the plaintiffs' charter is in § 1. A franchise is a branch of the sovereign prerogative, subsisting in the subject by a grant from the sovereign. 2 Bl. Com. 37. 3 Cruise Dig. tit. 27, § 1. Finch, 164. The provision in § 12 is not a grant of exclusive limits, nor of the exclusive right of railroad transportation within

certain defined limits ; it is not a grant of a franchise, nor of any kind of property; but merely an executory contract. *Charles River Bridge* v. *Warren Bridge*, 7 Pick. 344, and 11 Pet. 420. *Richmond, Fredericksburg & Potomac Railroad* v. *Louisa Railroad*, 13 How. 71. *Tuckahoe Canal* v. *Tuckahoe & James River Railroad*, 11 Leigh, 70, 71. *Dyer* v. *Tuskaloosa Bridge*, 2 Porter, 296. *Boston & Lowell Railroad* v. *Boston & Maine Railroad*, 5 Cush. 385. *Piscataqua Bridge* v. *New Hampshire Bridge*, 7 N. H. 57. *Livingston* v. *Van Ingen*, 9 Johns. 507. *Gibbons* v. *Ogden*, 9 Wheat. 1. " A grant is a contract executed." *Fletcher* v. *Peck*, 6 Cranch, 137. A grant by the State passes nothing by implication. 5 Cruise Dig. (Greenl. ed.) tit. 34, § 11, *& note.*

II. If the provision in § 12 be regarded merely as a contract, the plaintiffs' bill cannot be sustained. The plaintiffs pray for relief against an alleged nuisance. But a nuisance implies some right of property in the party injured. 3 Bl. Com. 217. Finch, 188. Fitz. N. B. 184. And the provision in § 12 being merely a contract between the Commonwealth and the plaintiffs, the acts done by a third party, under authority from the legislature, subsequently obtained, do not constitute a nuisance.

But assuming that there are grounds upon which, in cases of this nature, a court of equity will interfere, the alleged contract will not support this bill.

1. The contract is void; for the legislature have no right, by making such a contract, to deprive themselves of any of the essential attributes of sovereignty, such as the power to create revenues for public purposes, to provide for the common defence, to provide safe and convenient ways for the public necessity and convenience, to take private property for public uses, and the like. 3 Cruise Dig. (Greenl. ed.) tit. 27, § 29, *note.* 17 Vin. Ab. Prerogative, M. b. pl. 20. Bract. *l.* 2, *c.* 5. Chit. Prerog. 384. *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420. *Attorney General* v. *Richards*, 2 Anst. 605. Hale de Jure Maris, 12. *Attorney General* v. *Burridge*, 10 Price, 370, 372. *Commonwealth* v. *Alger*, 7 Cush. 53. *Weston* v. *Sampson*, 8 Cush. 347. *Peck* v. *Lockwood*, 5 Day, 22. *Gough* v. *Bell*, 1 Zab. 156.

*Arnold* v. *Mundy*, 1 Halst. 1. *Monongahela Navigation Co.* v. *Coons*, 6 W. & S. 107, 112. *Shrunk* v. *Schuylkill Navigation Co.* 14 S. & R. 71. *Susquehanna Canal* v. *Wright*, 9 W. & S. 9. *Rundle* v. *Delaware & Raritan Canal*, 14 How. 92. *Callender* v. *Marsh*, 1 Pick. 418. *Hollister* v. *Union Co.* 9 Conn. 436. *Lansing* v. *Smith*, 8 Cow. 146. *Brick Presbyterian Church in New York* v. *New York*, 5 Cow. 538. *Goszler* v. *Georgetown*, 6 Wheat. 593. *Brewster* v. *Hough*, 10 N. H. 138. *Fletcher* v. *Peck*, 6 Cranch, 143, by Johnson, J. The true precedents to be sought in England are those which concern the powers of the crown, and not those which concern the powers of parliament; for parliament may change the constitution of England.

2. The defendants not being parties or privies to the original contract, this bill cannot be maintained against them. The provision of § 12 is not a covenant real, which runs with, or is annexed to the thing granted — if indeed any thing can be said to be annexed to a franchise. *Keppell* v. *Bailey*, 2 Myl. & K. 517, 535. *Duke of Bedford* v. *British Museum*, 2 Myl. & K. 562. 4 Cruise Dig. (Greenl. ed.) tit. 32, *c.* 26, §§ 23, 24, & *note.* *Spencer's case*, 1 Smith Lead. Cas. 22, & *Amer. notes.* *Clark* v. *Swift*, 3 Met. 390.

3. If the Commonwealth is bound by this contract, it is not bound to respond in damages, nor are its agents liable to an injunction, but the remedy against the Commonwealth must be sought in the ordinary mode. The Commonwealth cannot be sued nor enjoined. *United States* v. *McLemore*, 4 How. 288. The agents of the Commonwealth cannot be restrained by injunction from constructing a state work within the prohibited limits; the damages thereby occasioned are *damnum absque injuria.* 1 Pick. 418, 9 Conn. 436, and 8 Cow. 146, above cited. The bill should at least allege an application to the Commonwealth for compensation.

III. Even if the provision in § 12 be regarded as a grant of property, the plaintiffs' bill cannot be sustained.

1. It alleges a mere taking of private property for public uses, under the right of eminent domain. If § 12 is to be treated as a grant of property, it must be considered a grant of the

monopoly of all railroad business between two lines extending from points, distant respectively five miles east and west of the northern terminus of the plaintiffs' road, to the extreme outer limits of Charlestown and Cambridge; and any part of this grant may be taken from the plaintiffs for public uses, upon compensation being made. A franchise may be taken for public uses. *Boston Water Power Co.* v. *Boston & Worcester Railroad,* 23 Pick. 360. *White River Turnpike* v. *Vermont Central Railroad,* 21 Verm. 590. *West River Bridge* v. *Dix,* 6 How. 507. *Richmond, Fredericksburg & Potomac Railroad* v. *Louisa Railroad,* 13 How. 71. So easements and other rights may be taken. *Ellis* v. *Welch,* 6 Mass. 246. *Parks* v. *Boston,* 15 Pick. 203. The general laws of the Commonwealth provide ample means for securing compensation, and a jury trial, to owners of private property taken for public uses. Rev. Sts. c. 39, §§ 56, 57; c. 24, §§ 13–38. If the acts of the defendants, securing a continuous line of railroad communication between Boston and Lowell, constitute the " making " of another railroad within the prohibited limits, as contended by the plaintiffs; and the plaintiffs under § 12 acquired any property which is so taken; then, as the defendant corporations, by Rev. Sts. c. 39, § 45, and the provisions of their respective charters, are each made subject to all general legislation, the plaintiffs' damages must be estimated by the county commissioners, under Rev. Sts. c. 39, § 56.

2. The plaintiffs have a distinct and more appropriate remedy, under *Sts.* 1851, c. 233, § 55, and 1852, c. 312, §§ 42, 86, by which any person whose private right or interest has been injured, or is put in hazard, by the exercise, by any private corporation, or any persons claiming to be a private corporation, of a franchise or privilege not conferred by law, may apply to this court for leave to file an information in the nature of a *quo warranto.* This case cannot be controlled by the consideration that in the somewhat analogous case of *Charles River Bridge* v. *Warren Bridge,* 6 Pick. 376, this court assumed jurisdiction in equity; because the plaintiffs in that case could not have availed themselves of either of the remedies open to the present

plaintiffs. A court of full equity powers having once obtained jurisdiction does not lose it when new powers are given to courts of law. 1 Story on Eq. §§ 64 *i*, 80. *Atkinson* v. *Leonard,* 3 Bro. C. C. 218. But this would seem to be otherwise in Massachusetts, for the jurisdiction of this court in equity in any particular case is made by statute to depend on there being no plain, adequate and complete remedy at law. Rev. Sts. *c.* 81, § 8. Mere diminution in the value of property will not furnish ground for relief in equity. *Attorney General* v. *Nichol,* 16 Ves. 338. *Earl of Ripon* v. *Hobart,* 3 Myl. & K. 169.

IV. Assuming that the legislature might lawfully make such a contract, or even grant of property, as is asserted to be contained in § 12, the plaintiffs' bill states no violation of any contract or grant. Every grant of a franchise, or in the nature of a franchise, must be construed strictly. *Earl of Leicester's case,* 3 Dyer, 362 *a.* *Gennings* v. *Lake,* Cro. Car. 169. *United States* v. *Arredondo,* 6 Pet. 738, 739, & cases cited. *Beaty* v. *Knowler,* 4 Pet. 168. *Providence Bank* v. *Billings,* 4 Pet. 514. *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420. *Richmond, Fredericksburg & Potomac Railroad* v. *Louisa Railroad,* 13 How. 81. The limitation, imposed upon the future action of the legislature, amounts only, in terms, to a prohibition against authorizing, within thirty years from 1830, any other railroad to be made, leading from Boston, Charlestown or Cambridge, to any place within five miles of the northern terminus of the Boston and Lowell Railroad. No such railroad has been made or authorized. And there is no charge of any such thing in the bill. The bill does not state that the granting of an act of incorporation to either of the defendant corporations was *per se* a violation of § 12; nor that the granting of a charter to the Salem and Lowell Railroad Company, which completed the chain, was *per se* such a violation; nor that the connection at Wilmington was *per se* such a violation. But the only statement is that the use of the roads or portions of the roads of the defendants in connection is illegal, and a violation of § 12. The legislature never covenanted that existing roads should not be used; but merely that no roads

within the prohibited limits should be authorized to be made. The plaintiffs' charter seems to contemplate the use of the road by other corporations, paying toll.

*C. G. Loring & R. Choate,* (*J. G. Abbott* was with them,) for the plaintiffs. I. The act of the legislature incorporating the plaintiffs, and their acceptance thereof, and acting and investing property under it, created a contract between the Commonwealth and the plaintiffs. *Dartmouth College* v. *Woodward,* 4 Wheat. 518. *West River Bridge* v. *Dix,* 6 How. 507. *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, and 7 Pick. 507. *Fletcher* v. *Peck,* 6 Cranch, 135. *New Jersey* v. *Wilson,* 7 Cranch, 164. *Terrett* v. *Taylor,* 9 Cranch, 50. *Green* v. *Biddle,* 8 Wheat. 92. *Providence Bank* v. *Billings,* 4 Pet. 560. *Gordon* v. *Appeal Tax Court,* 3 How. 133. *Osborn* v. *Bank of United States,* 9 Wheat. 738. *Gardner* v. *Newburgh,* 2 Johns. Ch. 162. *Livingston* v. *Van Ingen,* 9 Johns. 585, 589. *Cayuga Bridge* v. *Magee,* 6 Wend. 85. *Cayuga Bridge* v. *Stout,* 7 Cow. 33. *Croton Turnpike* v. *Ryder,* 1 Johns. Ch. 615. *Chesapeake & Ohio Canal* v. *Baltimore & Ohio Railroad,* 4 Gill & Johns. 3. *Enfield Toll Bridge* v. *Hartford & New Haven Railroad,* 17 Conn. 40. *Washington Bridge* v. *The State,* 18 Conn. 53. *Hartford Bridge* v. *East Hartford,* 16 Conn. 149. *Piscataqua Bridge* v. *New Hampshire Bridge,* 7 N. H. 35. *Wales* v. *Stetson,* 2 Mass. 146.

The plaintiffs' bill is well maintained without the aid of § 12. The legislature having determined that a public exigency existed, requiring a railroad from Boston to Lowell, and having, in the exercise of the power of eminent domain, and in consideration of the plaintiffs' undertaking to make such a road at their own expense, granted a right to the plaintiffs to construct one, have thereby exhausted their power on that subject, and cannot grant another road for a similar servitude. Such grant would be in derogation of the vested rights of the plaintiffs.

And the grant and establishment in § 5 of a toll, for the sole benefit of the plaintiffs, with a power reserved to reduce it to ten per cent. annually on the capital invested, restrains the legislature from directly or indirectly abolishing the toll, or reducing it below ten per cent.

2 *

But whatever might be the plaintiffs' rights, without § 12, that section amounts to a grant of the exclusive privilege of conveying passengers and freight between Lowell and Boston, &c. and was one which the legislature had a constitutional right to make, that body being the sole judges of its necessity and utility ; and this exclusive right, so granted, when accepted by the plaintiffs, became a portion of their property, and entitled to protection like other property. Cases above cited. Const. of Mass. *c.* 1, art. 4. *Richmond, Fredericksburg & Potomac Railroad* v. *Louisa Railroad,* 13 How. 71. *Gibbons* v. *Ogden,* 17 Johns. 488, and 4 Johns. Ch. 150. *Newburgh & Cochecton Turnpike* v. *Miller,* 5 Johns. Ch. 101. *Moor* v. *Veazie,* 31 Maine, 360, and 32 Maine, 343.

This section is to receive that construction, which will best carry into effect the intent of the parties to it. From the words of this section, and the spirit of the whole act, it clearly appears that the intention of the plaintiffs was to secure an exclusive right for a certain number of years, before investing their money in building a railroad, and that the intention of the legislature was to grant them such exclusive privilege, in order to induce them to make such investment. The meaning of the legislature being clear upon the face of the act, all technical rules as to the construction or form of particular terms are to be disregarded ; especially since the effect of the act is to make a contract between the State and the plaintiffs. Dwarris on Sts. 694, 695. *Huidekoper* v. *Douglass,* 3 Cranch, 70. *Charles River Bridge* v. *Warren Bridge,* 7 Pick. 462, 521, and 11 Pet. 597, 601. *Wilkinson* v. *Leland,* 2 Pet. 662. *Chesapeake & Ohio Canal* v. *Baltimore & Ohio Railroad,* 4 Gill & Johns. 3. Co. Lit. 56 *a.* Plowd. 205. *Saunders's case,* 5 Co. 12. *Somerset* v. *Dighton,* 12 Mass. 384. *Whitney* v. *Whitney,* 14 Mass. 92. *Stanwood* v. *Peirce,* 7 Mass. 460. Com. Dig. Parliament, R. 10–28. Bac. Ab. Statute, I. 5. *Boulton* v. *Bull,* 2 H. Bl. 499. Bac. Max. *reg.* 3. 1 Bl. Com. 88. 2 Inst. 496, 497. 1 Kent Com. (6th ed.) 460 *& note. Hartford Bridge* v. *East Hartford,* 16 Conn. 176. *Enfield Toll Bridge* v. *Hartford & New Haven Railroad,* 17 Conn. 56, 57

The stipulation in § 12 is not a mere executory contract, but rather a description and extension of the grant contained in § 1, making it a grant of an exclusive right to have a railroad between the limits defined, for thirty years. But if a mere contract executory, it is analogous to a covenant for quiet enjoyment, or a covenant against interruption by the grantor; it is a promise on the part of the legislature, for a consideration, that no competing road shall be made for thirty years, and is a contract which gives a peculiar character and value to the property granted; and the entire act, including this provision, was accepted by the plaintiffs, as a whole. Whatever is the subject of property may be taken by the legislature under the right of eminent domain. But if it were true that the legislature cannot take an executory contract for public uses, they can take the plaintiffs' road and all their property to which the contract relates. So that the power of the legislature to take is not affected by this provision; but, at most, only the measure of compensation.

This provision, which is a grant, license and contract with the plaintiffs, is, as against all others, an ordinance, obligatory strictly as law, irrepealable, or at least unrepealed, a legislative command to all to recognize and respect the plaintiffs' rights and privileges, and equivalent to a standing general law, that no person or corporation shall be authorized to make a competing road. Suarez de Leg. Lib. 1, *c.* 14, § 9; *c.* 17, § 13; Lib. 8, *c.* 6, § 1; *c.* 22, § 2; *c.* 23, § 1.

. II. The power to establish a competing line of railroad between Boston and Lowell cannot be acquired except by express grant from the legislature. And the legislature have manifested no intention to repeal § 12 of the plaintiffs' charter. Repeal by implication is not favored. *Chesapeake & Ohio Canal* v. *Baltimore & Ohio Railroad,* 4 Gill & Johns. 6. *Loker* v. *Brookline,* 13 Pick. 348. *Haynes* v. *Jenks,* 2 Pick. 176. *Snell* v. *Bridgewater Cotton Gin Manufacturing Co.* 24 Pick. 297, 298. *Goddard* v. *Boston,* 20 Pick. 410. *Bowen* v. *Lease,* 5 Hill, 221. *Planters' Bank* v. *The State,* 6 Sm. & Marsh. 628. The true rule of construction of the several acts relating to the plaintiff and

defendant corporations is, to take them all together, and give them such a construction, if possible, as will best protect the rights and privileges of each. The several roads of the defendants were established for distinct purposes, as appears by their charters, in two of which are express restrictions on any union which might affect the plaintiffs' rights. And a use of their roads, for the purposes complained of, is in fraud, not only of the plaintiffs' rights, but of the very acts of the legislature under which the right to make such use is claimed. Dig. Lib. 1, Tit. 3, § 29.

The act complained of is the causing to exist and be operated a railroad, leading from Boston to Lowell, almost parallel with the plaintiffs' road, and competing with it, on systematic design, for the through travel between those cities. The appropriating of portions of the three roads of the defendant corporations to a permanent new use, as a continuous road from Boston to Lowell, is a " making " of a road leading from Boston to Lowell, within the meaning of § 12. Richardson's, Johnson's and Worcester's Dictionaries, *verb.* " Make." Dig. Lib. 50, *c.* 16, § 218. *Thompson* v. *New York & Harlem Railroad,* 3 Sandf. Ch. 656. And the fact that the three sections of the defendants' roads are still used as parts of their distinct roads does not affect the case. Nor does the fact that the road so made is not all under the control of one corporation ; for it works the same mischief to the plaintiffs, and in the same way, as if it were.

The *St.* of 1852, *c.* 118, particularly relied on by the defendants, expressly requires the use by the Boston and Maine Railroad and the Salem and Lowell Railroad Company, of each other's roads, to be " according to law," that is, in a manner that will not conflict with existing laws, or interfere with rights previously granted by the legislature. And the provision, that this act shall not be construed to impair the rights of any person or corporation, in terms covers the right of the plaintiff corporation ; one of the most important of which is the exclusive right of transportation between Boston and Lowell.

Every statute is to be so construed, if possible, as to accord with the Constitution. The *St.* of 1852, upon the defendants'

construction, impairs the obligation of the contract between the Commonwealth and the plaintiffs. A law which in its practical operation impairs the obligation of a contract is as unconstitutional as one which in terms impairs such obligation. See cases cited *ante,* 17. Nor does the *St.* of 1852 declare the existence of a public exigency, as is requisite to authorize the legislature to exercise the power of eminent domain. Although the legislature may be the exclusive judges of the existence of the exigency, they must distinctly declare its existence, in order to authorize them to appropriate private property to the public use. And no compensation to the plaintiffs for the injury occasioned to their property is provided for in the act itself, or by any general law.

III. The infringement by the defendants of the plaintiffs' exclusive franchise of railroad transportation between Boston and Lowell is a nuisance to the plaintiffs' rights; and the proper remedy is by this process in equity for an injunction. 2 Eden on Injunctions, 271–276. Com. Dig. Chancery, D. 12. Jeremy on Eq. 310. *Croton Turnpike* v. *Ryder,* 1 Johns. Ch. 615. *Newburgh & Cochecton Turnpike* v. *Miller,* 5 Johns. Ch. 101. *Livingston* v. *Van Ingen,* 9 Johns. 585. *Gardner* v. *Newburgh,* 2 Johns. Ch. 162. *Ogden* v. *Gibbons,* 4 Johns. Ch. 174. *Frewin* v. *Lewis,* 4 Myl. & C. 255. *Osborn* v. *Bank of United States,* 9 Wheat. 841. *Charles River Bridge* v. *Warren Bridge,* 6 Pick. 376. *Piscataqua Bridge* v. *New Hampshire Bridge,* 7 N. H. 35. *Hartford Bridge* v. *East Hartford,* 16 Conn. 149. *Enfield Toll Bridge* v. *Hartford & New Haven Railroad,* 17 Conn. 40. *Yard* v. *Ford,* 2 Saund. 171. *Gates* v. *M'Daniel,* 2 Stew. 211. Rev. Sts. *c.* 81, § 8.

The plaintiffs' remedy is not upon the Rev. Sts. *c.* 39; for the bill proceeds not upon the ground of a lawful taking, but of a wrongful intrusion, not authorized by the statutes under which the defendants claim. Besides; the provisions of the Rev. Sts. c. 39, clearly have reference to an actual taking, and not to the injury to a franchise occasioned by a new use of roads already made. Such taking is not a taking by authority of the legislature, but by agreement of the corporations among themselves.

The remedy by information in the nature of a *quo warranto*, given by *Sts.* 1851, *c.* 233, § 52, and 1852, *c.* 312, § 42, cannot take away the jurisdiction of this court as a court of equity. *Varet* v. *New York Ins. Co.* 7 Paige, 560. *King* v. *Baldwin*, 17 Johns. 384. *White* v. *Meday*, 2 Edw. Ch. 486. *Wilson* v. *Kilcannon*, 1 Overton, 201. And the remedy under these statutes would afford no adequate relief for the injury sustained; for the defendants could not in that way be held to account, or to pay the damages sustained by the plaintiffs.

*J. Parker*, in reply. If the legislature, by the mere grant in § 1 of the right to build a railroad between Boston and Lowell, deprived themselves of the power to establish another road for a similar servitude, as was suggested for the plaintiffs, then § 12, which purports to bind the legislature for thirty years only, is unnecessary. But there is no authority to support this construction. If it were sound, the Charles River Bridge would have been saved; for the grant was as ample as that contained in § 1 of the plaintiffs' charter, and the Warren Bridge was for the same servitude. 7 Pick. 344. See also *Piscataqua Bridge* v. *New Hampshire Bridge*, 7 N. H. 57, and *Thompson* v. *New York & Harlem Railroad*, 3 Sandf. Ch. 625.

Nor does the mere grant of a right to take tolls exclude other grants of a similar character with the same right. And the provision in § 5 of the plaintiffs' charter, by which the legislature may reduce the tolls to ten per cent., can hardly operate to enlarge the grant itself so that the legislature may not make other grants affecting the tolls. If such might be its operation, the reservation of the power to reduce the tolls would serve to give the plaintiffs a much better right than they would have with an unlimited right to take tolls.

But the plaintiffs claim to sustain their bill mainly on the provisions of § 12, and in order to determine what rights they have under it, the court must ascertain the true character of that section. It has been called by the counsel " a grant," " a contract," " a law " and " an ordinance ; " and it has been said to give exclusive privileges, the nature of which has been differently stated in different parts of the argument. But the

defendants say that § 12 contains, not a grant, but a covenant; an executory, and not an executed contract. It may be quite important what character is impressed upon it.

If it is a grant of the exclusive right of transportation from Boston to Lowell, then, if valid, it would restrain all transportation between those places by any other road, however indirect. If it is an executed contract, having the character of a grant of exclusive limits, then the plaintiffs have, by that section, a franchise or property, subject to the power of eminent domain, and which may be taken when the public exigencies require it. But if it is a mere executory contract, and valid as such, it is a contract of restraint, and the plaintiffs can have no property in a restraint upon the legislature, which can be taken for the public use. A stipulation not to do is an executory contract, as much as an obligation to do a particular thing *Fletcher* v. *Peck*, 6 Cranch, 136. *Dartmouth College* v. *Woodward*, 4 Wheat. 682.

It will be borne in mind that the stipulation in § 12 is for something outside of and beyond the matter granted in § 1. It is as if a grantor, after having granted a tract of land, had made an agreement in a subsequent part of the deed, restraining himself from a particular use of his other lands adjoining. The plaintiffs' charter, while it has to a certain extent the form of a statute or law, is in effect a deed, or grant, or contract. For present purposes, it has the character of a deed. In § 1 is a grant of a franchise. The act also contains conditions and restrictions upon this grant, and prescribes the mode in which it is to be used. In § 12 is a covenant of the grantor. This covenant cannot enlarge the grant, although it might be referred to if the words of the grant were ambiguous. *Corbin* v. *Healy* 20 Pick. 516. *Mills* v. *Catlin*, 22 Verm. 98.

In order to give the plaintiffs' construction to § 12, as a part of the grant, we must not only change its form, but its substance; not only its terms, but its operation and effect.

A stipulation on the part of the legislature, that no other railroad from Boston to Lowell shall be authorized to be made, is one thing, clear and explicit. Any other railroad, not from

Boston to Lowell, may be authorized, and may transport passengers or freight without paying damages to the plaintiffs. But that being its character, if it is a valid agreement, the legislature cannot, by virtue of any right of eminent domain, grant another railroad from Boston to Lowell, even with a provision for the payment of damages. The stipulation would be broken the instant when such authority was given by the legislature. But any party, who could agree with the landholders, might build a railroad, and use it as a common carrier, if it could be done without interfering with the public highways. 11 Leigh, 72. And if there was such interference, the plaintiffs would have no concern with that. Upon that construction, the restraint is upon the legislature.

A grant of an exclusive right to build a railroad from Boston to Lowell is another thing, essentially different. If that is the character of the plaintiffs' right, not only may railroads be granted running from either place to other places, without any provision for the payment of damages to the plaintiffs, but another road might be granted from Boston to Lowell, the law making provision for the assessment of such damages as the plaintiffs should sustain by the new grant. There would, in that view, be no breach of any stipulation by the grant authorizing such other road to be built. But no party could build a road without a grant and payment of damages. The grant of the exclusive right would operate to restrain every one from building, unless he could show authority to take a part of the plaintiffs' franchise. The restraint would be upon individuals as well as upon the government.

There are two very important distinctions, therefore, between these two constructions; one relating to what will constitute a breach, and the other relating to the extent and operation of the grant. Upon what principle are the court authorized to change this covenant to a grant, and thus change its effect and operation, not merely from covenant to grant, but so that it gives other and different rights, and causes other and different restraints?

The difference between this case and that of the Piscataqua Bridge is shown by reference to 7 N H. 64, 65, 68, 69. There

the contract of the State with the plaintiffs was executed, and they had a property in the exclusive grant, and there was no mere stipulation or covenant of the State not to authorize another bridge within certain limits. The question of the right of the legislature to part with the power of eminent domain was not decided in that case, nor in 13 How. 75, 81; and that the legislature cannot surrender it was admitted by Justices Story and Thompson, in 11 Pet. 643, 644, 646, 650.

A mere executory contract of restraint cannot be taken under the right of eminent domain. [Thomas, J. Why not, if it is property?] There is no property in a mere contract not to do an act, which is capable of being taken. To take the restraint is to break the contract. In fact, we do not see how any mere executory contract can be taken for the public use. [Shaw, C. J. If a state makes a contract to convey land in five years, cannot the land be taken for a fort, if the public exigency requires it, within the five years?] Certainly. There the land is taken, not merely the agreement to convey.

But admitting the stipulation in § 12 to operate as a grant of property, if the defendants have only used their roads for a new purpose, as stated in the bill, it is no infringement of the stipulation. If they have thereby made a new road, as was said by the plaintiffs' counsel, it was under authority of the *St.* of 1852, *c.* 118, and of previous acts; and the plaintiffs' remedy, if their property is thus taken, is under Rev. Sts. c. 39, § 56. By the *St.* of 1852, the restrictions of former acts are removed, and the Boston and Maine Railroad and the Salem and Lowell Railroad Company are each authorized to enter on the road of the other " according to law." By earlier statutes, any railroad corporation may contract with any other, whose road enters upon or is connected with its road, to do all the transportation over said road. *St.* 1838, *c.* 99, § 1. And every railroad corporation is required at reasonable times, and for a reasonable compensation, to draw over its road the cars, &c. of any other corporation, authorized by the legislature to enter with its road upon, or to unite the same with the road of such corporation. *St.* 1845, *c.* 191, § 2. This last statute will not

allow the defendant corporations to refuse to draw each other's cars because they happen to come to Boston and Lowell. The clause in the *St.* of 1852, that nothing therein contained shall be construed to impair the rights of any person or corporation, is only the usual formal clause ; and if intended, as it is said, for the very purpose of protecting the plaintiffs, it is strange that it was not more distinctly expressed.

The authority conferred by the legislature to do the act of taking the property of another is a sufficient declaration that the public exigency requires it. It is not indispensable that the provision for compensation, if necessary, should be inserted in the same act which authorizes the taking. It is sufficient that the general laws of the Commonwealth make ample provision for compensation. Rev. Sts. *c.* 39, §§ 45, 56. *Dodge* v. *County Commissioners*, 3 Met. 380. If the plaintiffs cannot recover any damages, it is because the damages occasioned to them, by the use of the defendants' roads as a road between Boston and Lowell, are merely incidental to a lawful use of the defendants' roads, and afford no ground for compensation.

If any part of the plaintiffs' franchise has been taken, it was by the Lowell and Andover Railroad Company, when they entered upon and used the plaintiffs' road pursuant to their charter, as alleged in the bill ; and for such taking the plaintiffs have already had their damages assessed. The plaintiffs had no other property which was taken by the defendants under their respective charters, nor any property in the restrictions, imposed by those charters, on the use by the defendants of their several roads, although such restrictions might incidentally benefit the plaintiffs. The plaintiffs had no stipulation against the right of the defendants, like other railroad corporations, under general laws, to enter upon and use each other's roads. They had no stipulation against the defendant's right of selling tickets from one distant point to another, over several railroads, at a cheaper rate than if tickets were bought for each road separately. And what the defendants might lawfully do, they might lawfully advertise that they would do. The legislature were not bound to impose restrictions on the defendants in the

first instance, and having now taken them off, the defendants have the same rights as if the restrictions had never existed.

SHAW, C. J.* The first question usually considered in cases of equity is, whether the court has jurisdiction; and it has not been omitted in the present case.

The subject of controversy is a mere naked, incorporeal right, claimed by the plaintiffs, to have and enjoy a right to maintain a railroad, and take the tolls and profits thereof, a right created and granted to them by the government of the State; and they allege, whether correctly or not is hereafter to be considered, that the defendants have disturbed them, in the enjoyment of this incorporeal right. It is a right or title, which, if it exist at all, is purely a statute right. It is created by law, it exists only in contemplation of law, it is invisible, intangible and incapable of a physical possession, and depends on the law for its protection. It involves no complicated inquiry into facts; it depends mainly upon the enactment, the validity and legal construction of legislative acts. If the right exists and has been invaded, the appropriate and specific remedy, that which shall prevent the continuing invasion, is by injunction, and this can be afforded only in equity. On these grounds, we are of opinion that such a case is within the ordinary scope of equity jurisdiction, and that the jurisdiction is peculiarly appropriate to such a case. An injunction will generally be granted to secure the enjoyment of a statute privilege, of which the party is in actual possession, unless the right is doubtful. *Croton Turnpike* v. *Ryder,* 1 Johns. Ch. 611. *Newburgh & Cochecton Turnpike* v. *Miller,* 5 Johns. Ch. 101. *Livingston* v. *Van Ingen,* 9 Johns. 507.

In regard to the limited equity jurisdiction of this court, it is proper to state, that if the plaintiffs are disturbed in the enjoyment of their franchise or incorporeal right, such a disturbance is technically a nuisance. "If a ferry is erected on a river, so near another ancient ferry as to draw away its custom, it is a nuisance to the owner of the old one." 3 Bl. Com. 219. By statute, in this commonwealth, the court has jurisdiction in

---

* BIGELOW, J. did not sit in this case

equity in all cases of waste and nuisance; Rev. Sts. *c.* 81, § 8 ; and so it was considered in the early and analogous case of *Charles River Bridge* v. *Warren Bridge*, 6 Pick. 376.

II. The next question, material to be considered, is, what are the rights of the plaintiffs, under their act of incorporation ?

This was one of the earliest acts, providing for the establishment of railroads in this commonwealth, for the transportation of passengers and merchandise; so early indeed, and with so little foresight of the actual accommodations as they were afterwards provided and found necessary, that it was rather regarded as an iron turnpike, upon which individuals and transportation companies were to enter and run with their own cars and carriages, paying a toll to the corporation for the use of the road only; and the act authorized the corporation to make suitable rules and regulations, as to the form of cars, the times of running, &c. which might be found necessary to render such use of the railroad safe and beneficial.

Of course, neither the government nor the undertakers had any experience, and could not form any accurate or even approximate estimates of the cost of the work, or the profits to be derived from it. And it appears by the act itself, and its various additions, that the capital was increased from time to time, from $500,000 to $1,800,000. With this want of experience, and with an earnest desire on the part of the public to make an experiment of this new and extraordinary public improvement, it would be natural for the government to offer such terms, as would be likely to encourage capitalists to invest their money in public improvements; and after the experience of capitalists, in respect of the turnpikes and canals of the Commonwealth, which had been authorized by the public, but built by the application of private capital, but which as investments had proved in most instances to be ruinous, it was probably no easy matter to awaken anew the confidence of moneyed men in these enterprises.

In construing this act of incorporation, we are to bear in mind the time and circumstances under which it was made, but more especially to take into consideration every part and clause

of the act, and deduce from it the true meaning and intent of the parties. The act, like every act and charter of the same kind, is a contract between the government, on the one part, and the undertakers, accepting the act of incorporation, on the other; and therefore what they both intended, by the terms used, if we can ascertain it, forms the true construction of such contract.

It conferred, on the persons incorporated, the franchise of being and acting as a corporation, and the authority to locate, construct and finally complete a railroad, at or near the city of Boston, and thence to Lowell. That this was regarded as a public improvement, and intended for the benefit of the public, is manifest from the whole tenor of the act, more especially from the authority to take property, on paying a compensation in the usual manner, which would otherwise be wholly unjustifiable.

It is equally manifest, from the whole tenor of the act and the nature of the subject, that the work would require a large outlay of capital.

How then are the undertakers to be compensated for the work, thus provided for the public, at their expense? This is answered by § 5, which provides that a toll is granted, for the sole benefit of such corporation, upon all passengers and property of all descriptions, which may be conveyed or transported on said road, at such rates as the company, in the first instance, shall fix. This is in every respect a public grant, a franchise, which no one could enjoy but by the authority of the government. This grant of toll is subject to certain regulations, within the power of the government, if it should become excessive.

We are then brought to a consideration of § 12, upon which the stress of the argument in the present case has seemed mainly to turn. It provides that no other railroad than the one hereby granted shall, within thirty years, be authorized to be made, leading from Boston, Charlestown or Cambridge to Lowell, or from Boston, Charlestown or Cambridge to any place within five miles of the northern termination of the rail-

3*

road hereby authorized, that is, the termination at Lowell. The question is, does this provision confer any exclusive right, interest, franchise or benefit on this corporation? It is found in the same act; the whole is presented at once to the consideration of the corporators, to be accepted or rejected as a whole; and this would of course constitute a consideration in their minds, in determining whether to accept or reject the charter. If it adds any thing to the value and benefit of the franchise, such enhanced value is part of the price which the public propose to pay, and which the undertakers expect to receive, as their compensation for furnishing such public improvement.

This is a stipulation of some sort, a contract, by one of the contracting parties, to and with the other; in order to put a just construction upon it, we must consider the character and relations of the contracting parties, the subject matter of the stipulation, and its legal effect upon their respective rights.

It was made by government, in its sovereign capacity, with subjects, who were encouraged by it to advance their property for the benefit of the public. It was certainly a stipulation on the part of the government, regulating its own conduct, and putting a restraint upon its own power to authorize any other railroad to be built, with a right to levy a toll; but without an authority from the government, no other company or person could be authorized so to make a railroad and levy toll, and of course no other such road could lawfully be made. It was, therefore, equivalent to a covenant for quiet enjoyment against its own acts, and those of persons claiming under it. This is, in fact, all that the government could stipulate. It could not covenant with the corporation, for quiet enjoyment against strangers and intruders, against the unauthorized and illegal disturbance of their rights by third parties; against these, they would have their remedy in the general laws of the land.

But it has been argued that this stipulation, as it appears in the charter, is a mere executory covenant or undertaking, and is not an executed contract. But we think it may be both; so far as it confers a present right, it is executed; so far as it amounts to a stipulation that the covenantor will not disturb the enjoy-

ment of the right granted, it may be deemed executory. So a deed, conveying land, transfers, on its delivery, all the title and interest which the grantor can confer, and is also a stipulation that the benefit granted shall not be revoked or impaired. And this is held to apply to the grants of governments as well as to those of individuals. *Fletcher* v. *Peck*, 6 Cranch, 87. He who has the power of conferring a right or a franchise lying solely in grant, and who stipulates, for a valuable consideration, that another shall have and enjoy it, undisturbed and unmolested by any act or permission of his, in effect grants such right or franchise. But more especially, when such right is conferred by the community in the form of a statute, having all the forms of law, and sanctioned by the government, acting in behalf of all the people, and having power to bind them by law, such right would seem to be clothed with as much solemnity, and to have the same force and effect, as if it were the grant of an exclusive right in terms. We are therefore of opinion, that under this form of words, that no other railroad should be authorized to be made for thirty years, the government, as far as it was in their power, intended to engage with the corporation, that no other direct railroad between Boston and Lowell should be legally made; leaving them to guard themselves from unauthorized and illegal disturbance, by the general laws, in the course of the ordinary administration of justice. This is strengthened by the consideration, that as their whole remuneration would depend upon tolls, uncertain in amount, it was intended that they should be to some extent secure against any authorized road, taking the same travel, and of course the same tolls. There is a provision in the close of this § 12, which, in our judgment, adds some weight to this conclusion. There is a right reserved to the Commonwealth, after a certain term of years, to purchase the railroad, and all the rights of the corporation, on reimbursing them the whole cost, with ten per cent. profit, and then follows this provision : " And after such purchase, the limitation provided in this section [that no other railroad shall be authorized to be made] shall cease, and be of no effect." From this provision it is manifest that the restriction, as it is

termed, was imposed upon the government, and of course upon all the subjects, for the benefit of this corporation; and after the government should have succeeded to their rights, by purchase, then there would be no longer any occasion to impose any restriction on the government; it might do what it would with its own, and it would then be at liberty to make any other grant or not, at its pleasure. This carries a strong implication, that until such purchase, and so long as the income from tolls would enure to the benefit of the proprietors, the exclusive right, so far as these restrictions upon other railroads to take the same travel and the same tolls made it exclusive, should stand part of the charter.

III. But it is strongly urged, that if the legislature intended to grant such exclusive right, and the terms of the whole act, taken together, will bear and require that construction, and they did grant such exclusive right, and did restrain succeeding legislatures from making any grant or contract inconsistent with it, the provision itself was beyond the power of the legislature, and was void.

We readily concede that, for general purposes of legislation, the legislature, rightly constituted, has full power to make laws, to repeal former laws, and of course the last legislative act is binding, and necessarily repeals all prior acts, which are repugnant.

But in addition to the lawmaking power, the legislature is the representative of the whole people, with authority to control and regulate public property and public rights, to grant lands and franchises, to stipulate for, purchase and obtain all such property, privileges, easements and improvements, as may be necessary or useful to the public, to bind the community by their contracts therefor, and generally to regulate all public rights and interests.

It is under this authority that lands are granted, either in fee or upon any other tenure, that the uses of navigable streams and waters are regulated, the right to build over navigable waters, to erect bridges, turnpikes and railroads, and other similar rights and privileges, are granted and justified.

Of the necessity and convenience of all roads and other public works and improvements, of their fitness, and the best mode of providing them, the established government of the State, acting by the legislature for the time being, must necessarily judge and determine. They must decide whether it is best to provide for them, by funds from the public treasury; or to procure individuals to advance their own funds for the purpose, to be reimbursed by tolls; and to make just and adequate provisions, incident to each. Supposing ferries or bridges are obviously necessary over a long and broad river; it is equally obvious that no public convenience would require them to be built parallel and close to each other; on the contrary, such erections would be an unnecessary waste of property. Would it not be for the legislature to decide within what stated and fixed distances from each other public convenience would require them? If they were erected by funds drawn directly from the State, the legislature would plainly have the power to determine such distances, and provide that no one should be built within the distances thus fixed. May they not, with a due regard to the public exigencies and public interests, do the same thing, when such public works are erected by individuals, at the instance and procurement of the government, for public use? Were it otherwise; and were all such grants and stipulations repealable-by a subsequent legislature, because they are in the form of laws; then the unlimited power of the legislature to alter and change the laws, sometimes called, rather extravagantly, the omnipotence of parliament, would be a source of weakness, and not of strength. In making such grants and stipulations, no doubt great caution and foresight are requisite on the part of the legislature, a just estimate of the public benefit to be procured, and the cost at which it is to be obtained; and as great changes in the state of things may take place in the progress of time, a great increase of travel, for instance, on a given line, which changes cannot be specifically foreseen, it is the part of wisdom to provide for this, either by limitation of time, reservation of a power to reduce tolls, should they so increase, at the rates first fixed, as to become excessive,

or of a right to repurchase the franchise, upon equitable terms, so that the con ract shall not only be just and equal in the outset, but within reasonable limits continue to be so.   In the charter of the Boston and Lowell Railroad Corporation, the government reserved the right, both to regulate the tolls and to purchase the franchise, upon terms fixed and making part of the contract.   When such a contract has been made by the legislature, upon considerations of an equivalent public benefit, and where the grantees have advanced their money to the public, upon the faith of it, the State is bound, by the plain principles of justice, faithfully to respect all grants and rights, thus created and vested by contract.   Such a power of regulating public rights is everywhere recognized, as one distinguishable from that of legislation, a power incident and necessary to all well regulated governments, and when rightly exercised, is within the constitutional power of the legislature, and binding upon the government and people.

The court are of opinion that these principles are well established by authorities, a few of which only are cited. *Piscataqua Bridge* v. *New Hampshire Bridge,* 7 N. H. 35. *Livingston* v. *Van Ingen,* 9 Johns. 507.

In the case of *Charles River Bridge* v. *Warren Bridge,* both in this court and in the Supreme Court of the United States, it was not doubted that a state would be bound by a grant of an exclusive right to a bridge or ferry, made in terms by the legislature ; on the contrary, the validity of such grant was implied.   The controversy turned on the question, whether by the simple grant of a toll bridge or ferry, from one terminus to another, any exclusive right could be implied, to take toll for that line of travel, so as to bar the legislature from granting a right to build a bridge to and from other termini, on the same line of travel.   7 Pick. 344.   11 Pet. 420.

In *Fletcher* v. *Peck,* 6 Cranch, 135, the court say : " When a law is in its nature a contract, when absolute rights have vested under that contract, a repeal of the law cannot devest those rights."   So any law granting privileges to others, repugnant to those previously granted, which, if available, would be

a repeal by implication, is obnoxious to the same objection. That, which cannot be repealed in express terms, cannot be repealed by implication, by the enactment of laws repugnant to the provisions of the former act. The same defect of power which invalidates the one, has the same effect upon the other.

IV. But it is earnestly insisted that the grants to the defendant corporations do warrant and justify them in setting up the line of transportation by railroad, by the union of the several sections of their respective railroads; and that it may be regarded as lawfully done, under the right of the government to appropriate private property for public use. It is fully conceded that the right of eminent domain, the right of the sovereign, exercised in due form of law, to take private property for public use, when necessity requires it, of which the government must judge, is a right incident to every government, and is often essential to its safety. And property is *nomen generalissimum*, and extends to every species of valuable right and interest, and includes real and personal property, easements, franchises and incorporeal hereditaments. Even the term " taking," which has sometimes been relied upon as implying something tangible or corporeal, is not used in the Massachusetts Declaration of Rights; but the provision is this : " Whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor." Declaration of Rights, art. 10. Here again the term " appropriate " is of the largest import, and embraces every mode by which property may be applied to the use of the public. Whatever exists, which public necessity demands, may be thus appropriated. It was held in the Supreme Court of the United States, that a franchise to build and maintain a toll bridge might be so appropriated; and that the right of an incorporated company, to maintain such a bridge, under a charter from a state, might, under the right of eminent domain, be taken for a highway. *West River Bridge* v. *Dix*, 6 How. 507. The same point was afterwards decided in the same court, in the case of a railroad. *Richmond, Fredericksburg & Potomac Railroad* v. *Louisa Rail-*

*road*, 13 How. 83. Such appropriation is not regarded as impairing the right of property, or the obligation of any contract; on the contrary, it freely admits such right, and in all just governments provision is made for an adequate compensation, which recognizes the owner's right.

Nor does it appear to us to make any difference, whether the land, or any other right or interest thus appropriated, be derived directly from the government, or acquired otherwise; for the reason already stated, that it does not revoke the grant or annul or impair the contract, but recognizes and admits the validity of both. If, for instance, government, through its authorized agent, had contracted to convey land to an individual, and afterwards, and before the title passed, it should be necessary to appropriate such land to public uses, such taking would not impair the obligation of the contract; the individual would have the same right to compensation, for the loss of his equitable title to the land, as he would have had for the land itself, if the title to it had passed. If therefore, in the great advancement of public improvements, in the great changes which take place, in the number of inhabitants, in the number of passengers and quantity of property to be transported, or in great and manifest improvements in the mode of travel and locomotion, it becomes necessary to appropriate, in whole or in part, a franchise previously granted, the existence of which is recognized and admitted, we cannot doubt that it would be competent for the legislature, in clear and express terms, to authorize the appropriation of such franchise, making adequate compensation for the same.

But we cannot perceive in the acts of incorporation of the three defendant corporations, or in any of the acts in addition thereto, any act of the government, taking or appropriating any of the rights, franchises or privileges of the plaintiff corporation, under the right of eminent domain. The characteristics of such an act of appropriation are known and well understood. It must appear that the government intend to exercise this high sovereign right, by clear and express terms, or by necessary implication, leaving no doubt or uncertainty respecting such

intent. It must also appear, by the act, that they recognize the right of private property, and mean to respect it; and under our constitution, the act conferring the power must be accompanied by just and constitutional provisions for full compensation to be made to the owner. If the government authorizes the taking of property, for any use other than a public one, or fails to make provision for a compensation, the act is simply void; no right of taking as against the owner is conferred; and he has the same rights and remedies against a party acting under such authority, as if it had not existed. In general, therefore, when any act seems to confer an authority on another to take property, and the grant is not clear and explicit, and no compensation is provided by it, for the owner or party whose rights are injuriously affected, the law will conclude that it was not the intent of the legislature to exercise the right of eminent domain, but simply to confer a right to do the act, or exercise the power given, on first obtaining the consent of those thus affected.

Compared with these tests, there is no provision, in any legislative act to which we have been referred, which authorizes the defendant corporations to appropriate or use any of the rights of the plaintiffs. On the contrary, the latest act, and that most relied on, *St.* 1852, *c.* 118, negatives any such intent. It provides, that " the Boston and Maine Railroad Company may enter upon and use the Salem and Lowell Railroad, according to law. The Salem and Lowell Railroad Company may enter upon and use the Boston and Maine Railroad, according to law: Provided, that nothing contained in this act shall be construed to impair the rights of any person or corporation."

This act carefully limits what the terms might otherwise seem to grant, so that it shall not impair the rights of these plaintiffs. Whatever therefore these rights are, under their charter, they are not diminished or affected by any act of legislation, intending or professing to appropriate them to public use. We think therefore that, whatever may be the power of the legislature, there is no intention manifested on their part,

to appropriate any part of the plaintiffs' franchise, right or privilege, to public use; and of course those rights and privileges remain as they were granted and established by their charter; and this brings us back to the question before considered, what was the extent of those rights?

As the result of the whole case, the court are of opinion that the Boston and Lowell Railroad Corporation acquired by their charter and act of incorporation a right, at their own charge and expense, but for the public accommodation and use, to locate and construct a railroad from the city of Boston to Lowell, for the transportation and conveyance of persons and property between those places by railroad cars, and to levy and receive, for their own benefit and reimbursement, certain tolls, for the carriage of persons and property; and that, as a part of their franchise, privilege and right, and the better to secure to them a just and reasonable compensation and reimbursement, by the tolls so granted, the Commonwealth did, by the said act of incorporation, grant to and stipulate with the said corporation, that no other railroad, within the time therein limited, and not yet elapsed, should be authorized to be made, leading from Boston, Charlestown or Cambridge, (Charlestown then embracing the territory now composing the town of Somerville,) to any place within five miles of the northern termination of said railroad at Lowell. Without such authority of the legislature, we think that no such railroad within the limits prescribed could be lawfully made by other persons or corporations; and therefore this grant and stipulation, to a certain extent exclusive, was a part, and a valuable part of the plaintiffs' franchise; and that this grant and stipulation it was competent for the legislature, in behalf of the public, to make; and that the same was a valid grant and contract.

We are also of opinion that the legislature have not, since the granting of said charter, by right of eminent domain, taken, or manifested any intention to take, any part of the right and franchise of the plaintiffs for public use, and that no act or charter has been granted to the three defendant corporations, either or all of them, to take or use any part of the right and

franchise of the plaintiffs; and if in any manner the acts of the defendants, under color of their acts of incorporation, do infringe upon the rights of the plaintiffs, such infringement is not warranted by either or all of the same acts, it is unlawful, and constitutes a disturbance and nuisance to the plaintiffs, for which they are entitled to a remedy. We are also of opinion that the several defendant corporations, having been incorporated and chartered to establish railroads between several termini, according to their respective acts of incorporation, have no right, by the use and combination of several sections of their respective railroads, to establish a continuous and uninterrupted line of transportation by railroad, of persons and property, between Lowell and Boston; and that the actual establishment of such a continuous line of transportation by railroad is substantially making a railroad, other than that authorized to be made by the plaintiffs, to their injury, and contrary to the rights conferred on them by their charter.

*Demurrer overruled.*

After the foregoing opinion was delivered, the plaintiffs applied for a temporary injunction. On this application a hearing was had, and depositions were read and arguments made for both parties. And the court, on the 1st of February 1855, issued an injunction, to continue in force while this suit was pending, or until the further order of the court, " to enjoin and restrain the said defendant corporations, and each of them, and their several officers, agents and servants, and all persons in the employment of the said defendant corporations, or either of them, [under the penalty of thirty thousand dollars,] against carrying, transporting or conveying any persons, or property of any kind, by one continuous line of conveyance by railroad cars proceeding from Lowell, or from any point within five miles of the northern terminus of the Boston and Lowell Railroad, and from thence to Boston in the County of Suffolk, or to Charlestown, Cambridge or Somerville in the County of Middlesex, or from said Boston, Cambridge, Charlestown or Somerville, to said Lowell, or any point within five miles of the northern terminus of the

Boston and Lowell Railroad, by one continuous line of convey-
ance by railroad cars, between the said termini; and from doing
any act or acts towards the effecting or accomplishing such
transportation of persons or property, by connecting together,
or using in connection certain sections of their respective rail-
roads, as follows, namely: The section of the Boston and Maine
Railroad lying between Boston and its intersection with the
Salem and Lowell Railroad at Wilmington; that section of
the Salem and Lowell Railroad which lies between the last
named point and the intersection of said Salem and Lowell
Railroad with the Lowell and Lawrence Railroad in Tewks-
bury; and that section of the Lowell and Lawrence Railroad,
between said last mentioned place of intersection and its termi-
nation in Lowell; or by any variation or alteration of said places
of junction and intersection, or in any other mode, using any
sections of said several railroads in such manner as to form
a continuous line of conveyance by railroad of persons or prop-
erty between the said termini. And the said three defendant
corporations, their officers, agents, servants, and all persons
employed by them, are enjoined and prohibited from using or
employing any of the means heretofore stated towards the
formation, establishment or maintenance of any such continuous
line of conveyance of persons or property, in any of the modes
following, to wit:

"1st. By any agreement or understanding between themselves,
to the effect that either of said corporations shall have the use
of the cars of either of the other of said corporations, on its
own section of railroad, in such a manner as to form one
continuous and uninterrupted transportation of persons or
passengers over the said sections of said different railroads, or
any two of them, without change of cars or loss of time, or
either of them.

"2d. Or by taking passengers at one of the said termini to
be carried or transported to the other of said termini, without
change of cars at the places where any one of the said sections
of the said several railroads intersects with either of the other
of the said sections; or in any other mode from engaging,

procuring, employing and using any car or cars, at their common expense or otherwise, for the conveyance of persons or property, for running and passing upon or over the said sections of their respective railroads without change of cars, from either of said termini to the other.

" 3d. Or by receiving money at either of said termini, as fare or compensation for the passage of any person from one of the said termini to the other, or by selling a ticket for the entire passage, or by taking, at one and the same time and place, payment for said tickets on the several sections of the said respective railroads of the different corporations, or by taking payment in a car, on one section, for a passage on any other section or sections of the same line.

" 4th. Or by advertising any notice, in any newspaper, pamphlet, written or printed paper, card, circular letter, or by printing or posting up, or causing to be printed or posted up any handbill, placard, or other like paper, giving notice that passengers or merchandise may be carried and transported by railroad through from one of the said termini to the other by one continuous line, or that a passage may be had from one of said termini to the other without change of cars and without stoppage or detention at the said several points of intersection.

" 5th. Or by painting, or in any way placing upon their cars or any or either of them, the words " Boston and Lowell," or " Lowell and Boston," or by continuing the same or similar words on their said cars or any one of them, or in any other way giving information that a direct and uninterrupted passage by railroad may be had between said termini ; or from entering into any other arrangement, or doing any other act, the intent and purpose of which may be to effect a continuous line of travel by railroad for passengers and merchandise in a direct and uninterrupted course between said termini ; or from agreeing to use, or actually using the sections or any sections, constituting parts of the lines of their respective railroads, in such manner as form a continuous line of travel or transportation of persons or property from the one to the other of the said termini."

4 *

Boston and Lowell Railroad Corporation *v.* Salem and Lowell Railroad Co. & others.

The following is a copy of the statute of 1855, *c.* 386, passed on the 18th of May 1855 :

" An act to establish an independent line of railroad communication between Boston and Lowell.

" SECTION 1. The Lowell and Lawrence Railroad Company, the Salem and Lowell Railroad Company and the Boston and Maine Railroad are hereby authorized to make arrangements between themselves for the use in common of those sections of their several railroads which lie between Lowell and Boston, to wit : That section of the Lowell and Lawrence Railroad which lies between Lowell and the point of junction with the Salem and Lowell Railroad in Tewksbury ; that section of the Salem and Lowell Railroad which lies between said last named point and a convenient point of junction with the Boston and Maine Railroad in Wilmington ; and that section of the Boston and Maine Railroad which lies southwardly of said last named point. And the above named corporations, in conformity to such arrangements, may use said sections of their several railroads, or permit the same to be used, for the transportation of persons and property.

" SECTION 2. Any person or corporation who may sustain damage by reason of any acts done by the three corporations above named, or either of them, in pursuance of the authority granted by this act, may have the same estimated in the manner now provided by law for the estimation of damages caused by the laying out, making and maintaining of a railroad ; but the application shall be made to the county commissioners of the county of Middlesex ; and if either party, being dissatisfied with such estimate of damages, shall apply for a jury, the jury shall be taken from such towns in said county as any justice of the court of common pleas shall direct, and the sheriff shall apply to some one of said justices for such direction, and it shall be the duty of said justice to name the towns from which the jury shall be taken in the manner prescribed by law.

" SECTION 3. The three railroad corporations named in the first section of this act are authorized to run trains through from Lowell to Boston, and from Boston to Lowell, over the three aforesaid sections of railroad, without change of cars or loss of time, for the conveyance of passengers and merchandise over any portion of the line between Boston and Lowell, and to sell tickets, and to receive payment of money in their cars for the transportation of passengers as aforesaid, and to make joint tariffs for the transportation of merchandise : *provided*, that this section shall not be construed to permit said corporations, or either of them, to transport passengers or freight from Boston, Charlestown, Cambridge or Somerville, to any point within five miles of the northerly terminus of the Boston and Lowell Railroad, or from any point within five miles of the northerly terminus of said last named railroad to Boston, Charlestown, Cambridge or Somerville.

" SECTION 4. The first two sections of this act shall take effect when the same shall have been accepted by all the corporations therein named ; but the last two sections shall take effect from and after the passage of this act."